RECEIVED
OCT - 5 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| GLENN ALAN HEBERT | * | CIVIL ACTION NO. 04-1384 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Glenn Alan Hebert, born December 11, 1955, filed an application for supplemental security income on December 19, 2001, alleging disability as of November 19, 2001, due to pain in his right leg, ankle, knee, hip, back and shoulders, headaches, and high blood pressure.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Report from Dr. Michel E. Heard dated September 13, 2000.** Claimant complained of pain in his right hip and right lower leg, and of right knee instability. (Tr. 95). He reported that he had been involved in a motor vehicle accident in 1973 for which he had had surgery and worn a cast for about two years. He said that his right hip pain was mild and intermittent, and his right lower leg pain was constant.

On examination, claimant was 5 feet 11 inches tall and weighed 187 pounds. He walked without a limp. X-rays showed a healed proximal tibial fracture and mild degenerative changes in the right knee.

Dr. Heard's impression was a healed proximal tibial fracture with probable post-traumatic arthritis in the right knee. He limited claimant to light and sedentary activities, work, and recreation. He prescribed Mobic.

**(2) Records from Dr. Randall J. Faulk dated November 15, 2001.** Claimant complained that his right knee felt "snapped." (Tr. 98). His blood pressure was 160/120. Dr. Faulk's impression was right knee pain rule out meniscus tear and hypertension.

**(3) Records from University Medical Center ("UMC") dated November 19, 2001 to December 17, 2001.** On November 19, 2001, claimant complained of right

2

knee pain for the past four days. (Tr. 109). On examination, he had good pulses. (Tr. 106, 109). X-rays showed a healing fracture deformity of the proximal tibial shaft and degenerative narrowing of the medial and lateral compartments. (Tr. 104). He was released to light activity. (Tr. 107).

On December 17, 2001, claimant complained of right knee pain with swelling, numbness and tingling, left hip pain, and right ankle pain. (Tr. 102). Right knee x-rays showed a healing fracture of the tibia, narrowing of the right knee joint space, and no acute fracture. (Tr. 101).

**(4) Records from Gardiner Community Health Center dated January 14, 2002 to April 9, 2002**. On January 14, claimant complained of left shoulder and left leg pain for two weeks. (Tr. 116). His blood pressure was 162/110. The assessment was chronic pain and hypertension, uncontrolled.

On January 28, claimant complained of right leg pain, left shoulder pain radiating to the hand with numbness, and a knot to the left elbow. (Tr. 112). His blood pressure was 160/110. The assessment was uncontrolled hypertension and right knee pain. He was prescribed Lotrel for blood pressure and Tylenol for arthritis. On April 9, 2002, claimant's blood pressure was 120/86. (Tr. 111).

**(5) Records from Abrom Kaplan Memorial Hospital dated November 13, 2001 to April 24, 2002**. On November 13, 2001, claimant complained of constant

3

throbbing pain in the right knee which radiated to the lower right calf. (Tr. 129). X-rays showed osteoarthritic changes about the knee along with evidence of an old proximal tibial fracture. (Tr. 137).

On April 24, 2002, claimant complained that his right knee had given out on him, causing him to land on his right side. (Tr. 119). X-rays of the chest and right ribs were normal. (Tr. 127). The diagnosis was a contusion of the right chest wall. (Tr. 119). He was instructed to take Advil. (Tr. 119, 122).

**(6) Report from Dr. Kenneth A. Ritter, Jr. dated May 29, 2002.** Claimant complained of right leg pain since a crush injury in a motor vehicle accident at age 17. (Tr. 138). He reported pain in his right knee, right ankle, right hip, right trapezius area, and right neck area, daily headaches, and high blood pressure. He was taking Lotrel for blood pressure and Ultram for pain.

On examination, claimant was 5 feet 10 ½ inches tall and weighed 194 pounds. (Tr. 139). His blood pressure was 162/98. He ambulated with a slight limp favoring his right leg. He used a crutch, stating that his right knee felt like it was going to give away.

Claimant had no ankle swelling. His DP pulses were 2+ and equal bilaterally. The range of motion of his knees was full and normal with no redness, heat, and tenderness or swelling of any joint. Neurologically, he was intact with normal DTRs,

4

strength and sensation.

Dr. Ritter's impression was hypertension with elevated blood pressure on examination. (Tr. 140). He noted that claimant had a relatively long history of uncontrolled hypertension "with apparently some degree of compliance problems here." As to claimant's right knee, right ankle, right hip and right lower back pain, Dr. Ritter noted that claimant's work-up had revealed some post-traumatic arthritis in his right knee and that claimant "may need a surgical procedure of some type performed on the knee in the future to alleviate some of his pain."

Dr. Ritter noted that claimant might possibly need a crutch for walking, standing or both, "just in case." (Tr. 141). He stated that claimant could stand for greater than three hours, and had full use of his other upper extremity for carrying.

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter determined that claimant could lift 15-25 pounds occasionally and 10-15 pounds frequently. (Tr. 142). He could stand/walk about four to six hours out of an 8-hour day, and 2-4 hours without interruption. He stated that claimant's ability to sit was not affected by his impairment. He opined that claimant could rarely climb; occasionally stoop, kneel, crouch and crawl, and frequently balance.

Dr. Ritter commented that with good medication, possibly even surgery, "I'm pretty sure he will be able to perform significantly better in the future." (Tr. 143).

**(7) Residual Functional Capacity ("RFC") Assessment dated July 17, 2002.**

Claimant was found to be able to lift 20 pounds occasionally and 10 pounds frequently. (Tr. 146). He could stand/walk at least 2 hours, and sit about 6 hours, in an 8-hour workday. He had limited push/pull ability in his lower extremities. He was able to climb ramps and stairs occasionally, but not ladders, ropes, and scaffolds. (Tr. 147).

The examiner noted that claimant had a medically determinable impairment that would cause some limitations of daily activity. (Tr. 150). However, claimant's alleged limitations were disproportionate with the medical findings. Claimant's statements were felt to be partially credible.

**(8) Records from UMC dated May 20, 2002 to September 23, 2002.**

Claimant complained of right knee pain and of his knee giving out on him. (Tr. 157). X-rays of the right knee showed moderate osteoarthritic changes involving the femoropatellar and knee joint with narrowing of the medial joint space. (Tr. 156). Left knee x-rays showed minimal lateral subluxation of the patella with more widening of the medial joint space as compared with the previous examination. (Tr. 155).

On September 23, claimant complained of right knee pain, numbness, tingling and swelling. (Tr. 153). He also reported "Charley horses" in the right thigh and calf. On examination, he had no effusion, range of motion from 0-110 degrees and tight hamstrings. He was instructed to take NSAIDS, perform hamstring stretching, and to return to the orthopedic clinic as needed.

**(9) Claimant's Administrative Hearing Testimony.** At the hearing on August 14, 2003, claimant was 47 years old. (Tr. 161). He was a high school graduate. He had worked as a certified truck driver. (Tr. 162-65). He had last worked in 1989. (Tr. 162).

Regarding complaints, claimant testified that he had had problems with his right leg since he was hit by a car while riding a motorcycle in 1973. (Tr. 165). He said that his primary problems were with his right knee, right hip, ankle, lower back, and shoulders. (Tr. 166, 171). He also reported that he had "very bad" headaches. (Tr. 166).

Claimant testified that he had been undergoing pain management with Dr. Hodges for the past year.[1] (Tr. 166-67). He stated that he was taking Ultram and Lortab for pain. (Tr. 167). He reported that he was also taking sleeping medication.

---

[1] While claimant's attorney had requested an additional 20 days to obtain reports from Dr. Hodges, they are not in the record. (Tr. 167).

7

(Tr. 168).

As to limitations, claimant testified that he could barely walk, and had to use a cane. (Tr. 168). He said that he could barely climb stairs. He reported that he could not crawl, stoop, kneel, bend, or lift. (Tr. 168-69, 171). He stated that he had fallen, and had bruised three ribs the previous year after his leg gave out. (Tr. 169).

Claimant reported that he had to lie down four times a day for an hour each time to alleviate the pain. (Tr. 169-70). He testified that medication also help to relieve the pain. (Tr. 170). He stated the medication made him drowsy and dizzy.

Claimant also complained that he did not sleep well, which was why he was taking pills. He stated that he had problems concentrating as well. He reported that he could not work because he would miss four out of five days due to serious pain. (Tr. 171).

Regarding activities, claimant testified that he had a driver's license and drove at least once a day. (Tr. 172).

**(10) Administrative Hearing Testimony of Wendy Klamm, Vocational Expert ("VE").** Ms. Klamm classified claimant's work as a tractor-trailer driver, tank truck driver, industrial truck operator, and light truck driver as medium and semi-skilled. (Tr. 174-77). She said that he had transferable skills from the operation of machinery. (Tr. 177).

8

The ALJ posed a hypothetical in which she asked the VE to assume a claimant who could lift 25 pounds occasionally and 15 pounds frequently; stand and walk for six out of eight hours, two to four hours continuously; sit for six out of eight hours, two to four hours continuously; never climb, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 178). In response, Ms. Klamm testified that claimant could not return to his past work, but could work as a gate guard, of which there were 5,200 positions statewide and 329,200 nationally; meter reader, of which there were 1,500 positions statewide and 54,950 nationally, and central supply worker, of which there were 3,700 jobs statewide and 256,700 nationally. (Tr. 178-79).

In the next hypothetical, the ALJ added the use of a crutch or crane for support and balance "just in case." (Tr. 179). In response, the VE testified that gate guard and meter reader would fall within the hypothetical, but central supply worker would not. However, she identified the alternative position of host, of which there were 2,000 positions statewide and 146,500 nationally. When the ALJ changed the hypothetical to required use of a crutch or cane, Ms. Klamm testified that the gate guard, meter reader, and host jobs would fit. (Tr. 180).

Finally, the ALJ asked whether claimant could do his past work or any other work if, by exertional and non-exertional limitations, he was limited to less than sedentary work. In response, Ms. Klamm replied "No." When claimant's attorney

9

asked whether claimant would be able to perform any of the identified jobs if he had to lie down approximately four times a day and would miss four out of five days of the workweek, she responded "No." (Tr. 180-81).

**(11) The ALJ's Findings are Entitled to Deference**. Claimant argues that the ALJ erred: (1) in failing to consider his complaints of disabling pain and ignoring the medical evidence supporting them, and (2) in assessing his RFC and concluding that his RFC allowed for a full range of light work when that conclusion was not supported by the medical evidence.

As to the first argument, claimant asserts that ALJ contradicted herself by stating that he could perform a *restricted* range of light work in one part of the opinion, then later stating that he could perform a *significant* range of light work. (emphasis added). (rec. doc. 12, p. 3; Tr. 14, 16). Although these statements appear contrary at first glance, a careful review of the decision reflects that they are referring to two different determinations. (Tr. 14, 18).

The ALJ recognized that claimant was unable to perform the full range of light work (*i.e.*, a restricted range) because of his additional exertional and non-exertional limitations. (Tr. 16). Accordingly, the ALJ called a vocational expert to determine whether or not there were a *significant number* of jobs that claimant could perform in light of his limited RFC. (emphasis added). (Tr. 16-18). This is precisely what

10

the ALJ was required to do under the regulations.

If impairments are solely exertional or the non-exertional impairments do not sufficiently affect the claimant's residual functional capacity, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If, however, the claimant suffers from non-exertional impairments or a combination of exertional and non-exertional impairments, then the Commissioner *must* rely on a vocational expert to establish that such jobs exist in the economy. (emphasis added). *Id.*

Here, the ALJ acknowledged that claimant's ability to perform substantially all of the requirements of light work was impeded by additional exertional and/or non-exertional limitations, including pain. (Tr. 16). Because of these non-exertional limitations, she called a vocational expert to determine whether or not there were a "significant number of jobs" that he could perform given his RFC. Based on the VE's testimony, the ALJ concluded that claimant was "capable of making a successful adjustment to work that exists in significant numbers in the national economy." (Tr. 17). However, on the next page, she stated that claimant had the RFC to "perform a significant range of light work." (Tr. 18).

Despite these seemingly contradictory statements, a review of the ALJ's entire decision reflects that she performed the proper analysis in assessing claimant's RFC. Any such error is harmless. The harmless error rule is appropriate when "remand would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969). The Fifth Circuit has applied this rule in social security disability cases. *Frank v. Barnhart* 326 F.3d 618, 622 (5th Cir. 2003). Accordingly, this argument lacks merit.

Next, claimant argues that the ALJ erred in finding that he could perform light work in light of the medical evidence as to his pain and limitations. (rec. doc. 12, p. 5). The record reflects that the ALJ thoroughly evaluated the medical records in finding that claimant could perform a restricted range of light work. (Tr. 13-14). In particular, she gave great weight to Dr. Heard's finding that claimant was able to perform light and sedentary activities because of his expertise in orthopedic surgery. (Tr. 14, 95). Generally, a specialist's opinion is to be accorded greater weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Dorsey v. Heckler*, 702 F.2d 597, 603 (5th Cir. 1983). This finding is further supported by claimant's treating physicians at UMC, who stated that claimant could perform light activity. (Tr. 107).

Additionally, the ALJ noted that while Dr. Ritter had mentioned surgery, it was not imperative that claimant have surgery. (Tr. 14). She noted that claimant had "gotten by for years without surgery," and could still perform a restricted range of light work in his current condition. She further observed that the pain medication he was taking was for mild to moderate pain, and not for severe pain.

To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing pain. *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *Id.* Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by objective medical testimony. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

The record reflects that the ALJ considered claimant's complaints of pain in accordance with Fifth Circuit standards. (Tr. 14). In doing so, she correctly considered the fact that claimant's pain was managed with medication and did not require surgery. If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d

13

55, 59 (5th Cir. 1987).

Finally, claimant argues that the ALJ failed to consider Ms. Klamm's testimony that there would be no jobs available for a claimant who had to lie down approximately four times a day and would miss four days out of a five-day workweek. (rec. doc. 12, p. 7; Tr. 180-81). However, that testimony was in response to claimant's attorney's hypothetical assumption. This testimony was rejected by the ALJ, which is within her discretion. The ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir.1985); *Falls v. Apfel*, 2000 WL 329233, *7 (E.D.La.2000). Accordingly, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed this 4 day of October, 2005, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT:
DATE: 10-5-05
BY: ___
TO: TLM
CMH